# Reconsideration of Prior Opinion
# Concerning Land-Grant Colleges

After reconsideration of a prior opinion, we adhere to the conclusion that the State of West Virginia may validly designate West Virginia State College as the beneficiary of appropriated funds under the Second Morrill Act of 1890.

Reversing our prior conclusion, we find that the State's designation of the College as a Second Morrill Act beneficiary does not make that institution eligible for funds appropriated under certain statutes administered by the Department of Agriculture.

December 23, 1993

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF AGRICULTURE

This responds to your request that this Office reconsider our opinion that West Virginia may designate West Virginia State College ("State College") as the beneficiary of appropriated funds under the Second Morrill Act, ch. 841, 26 Stat. 417 (1890) (codified as amended at 7 U.S.C. §§ 321-326, 328) ("Second Morrill Act"), and that, upon such designation, State College would become eligible to receive appropriated funds for agricultural research and extension under 7 U.S.C. §§ 3221, 3222, and 3223.[1]

After reviewing the matter once more, we hereby withdraw our original opinion in favor of the revised views expressed in this memorandum. As explained below, we adhere to our earlier conclusion that West Virginia may validly designate State College as the beneficiary of appropriated funds under the Second Morrill Act. We reverse, however, our original conclusion that West Virginia's designation of State College as a Second Morrill Act beneficiary made that school eligible for funds appropriated pursuant to 7 U.S.C. §§ 3221, 3222, 3223 and similar statutes. (Following the usage of Agriculture, we shall refer to these statutes collectively as the "1890 derivative statutes") Rather, we conclude that State College is not eligible for funds under the 1890 derivative statutes.

## I.
## AN OVERVIEW OF THE LEGAL HISTORY
## OF THE LAND-GRANT COLLEGE SYSTEM

A knowledge of the legal history of the land-grant college system is essential to interpreting the Second Morrill Act and the 1890 derivative statutes. In Subpart A below, we discuss the following four cornerstones of the statutory structure:

---

[1] *See* Letter for Alan Charles Raul, General Counsel, Department of Agriculture, from Principal Deputy Assistant Attorney General Douglas R. Cox, Office of Legal Counsel (Aug 21, 1992), Letter for Douglas R Cox, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from James Michael Kelly, Associate General Counsel, Department of Agriculture (Oct. 23, 1992) ("Request for Reconsideration"). Hereinafter, references to "Agriculture' mean the Department of Agriculture

184

## *Table 1*

| Statute | Enactment | Main Object of the Legislation |
|---|---|---|
| First Morrill Act | 1862 | Grants states public lands to sell for endowment of agricultural & mechanical colleges |
| Hatch Act | 1887 | Authorizes funds for agricultural research at experiment stations established at land-grant colleges or independently by a state |
| Second Morrill Act | 1890 | Authorizes supplemental operating funds for land-grant colleges |
| Smith-Lever Act | 1914 | Authorizes funds for agricultural extension at land-grant colleges |

In Subpart B below, we discuss the evolution of the land-grant college system in West Virginia and elsewhere prior to the enactment of the 1890 derivative statutes. In Subpart C below, we discuss the 1890 derivative statutes.

### A.

*The First Morrill Act.* The land-grant college system began in 1862 with the First Morrill Act, ch. 130, 12 Stat. 503 (1862) ("First Morrill Act").[2] That statute provided the states with grants of public land or equivalent land scrip. *Id.* § 1, 12 Stat. at 503. The states that chose to "take and claim the benefit" of the First Morrill Act were required to invest the funds derived from the sale of the land or land scrip in such fashion that the principal would "remain forever undiminished." *Id.* § 4, 12 Stat. at 504. The states were further required to devote the interest generated by such funds exclusively to the "endowment, support, and maintenance of at least one college where the leading object shall be . . . to teach such branches of

---

[2] For accounts of the history of the college land-grant system, *see* Joseph B Edmond, *The Magnificent Charter The Origin and Role of the Morrill Land-Grant Colleges and Universities* (1978); Allan Nevins, *The State Universities and Democracy* (1962), Edward D Eddy, *Colleges for Our Land and Time: The Land-Grant Idea in American Education* (1957), and Earle D. Ross, *Democracy's College: The Land-Grant Movement in the Formative Stage* (1942) For a recent study of the origins of the college land-grant system, *see* Roger L Williams, *The Origins of Federal Support for Higher Education George W Atherton and the Land-Grant College Movement* (1991), *see also Knight v Alabama,* 787 F Supp. 1030, 1040-53, 1167-72 (N.D. Ala 1991) (outlining origins and development of college land-grant system with special reference to Alabama), *aff'd in part, rev'd in part, & vacated in part,* 14 F 3d 1534 (11th Cir 1994), *Ayers v Allain,* 674 F Supp 1523, 1543-50 (N D. Miss 1987) (providing less detailed history of land-grant system with special reference to Mississippi), *aff'd,* 914 F 2d 676 (5th Cir 1990) (en banc), *vacated sub nom. United States v Fordice,* 505 U S 717 (1992)

learning as are related to agriculture and the mechanic arts." *Id.* The states were required to express acceptance of the land grant (or land scrip) through their legis-latures.[3] Once a state had accepted, it would still lose its benefit unless it provided "within five years . . . not less than one college" of the prescribed kind. *Id.* § 5, 12 Stat. at 504.

*The Hatch Act.* The Act of Mar. 2, 1887, ch. 314, 24 Stat. 440 (codified as amended at 7 U.S.C. §§ 361a-390d) authorized appropriations for agricultural re-search at experiment stations under the direction either of a college "established, or which may hereafter be established, in accordance with the provisions of [the First Morrill Act]" or an independent station established by a state. *See id.* §§ 1, 2, 8, 24 Stat. at 440-42. Unlike the First Morrill Act, the Hatch Act provided for pay-ments by the federal government directly to the beneficiary institutions, although the appropriations were still said to be "to each State." *Id.* § 5, 24 Stat. at 441. In states having two colleges established under the First Morrill Act, the funds were to be divided equally unless the state's legislature directed otherwise. *See id.* § 1, 24 Stat. at 440.

*The Second Morrill Act.* The Second Morrill Act provided an annual appropri-ation of funds "to each State . . . for the more complete endowment and mainten-ance of colleges for the benefit of agriculture and the mechanic arts now estab-lished, or which may be hereafter established, in accordance with [the provisions of the First Morrill Act]." § 1, 26 Stat. at 417-18. The funds so appropriated were to be paid to the state treasurer "designated by the laws of such State . . . to receive the same" and then "immediately [paid] over . . . to the treasurers of the respective colleges . . . entitled to receive the same." *Id.* § 2, 26 Stat. at 418. The use of the funds was restricted to "instruction in agriculture, the mechanic arts, the English language and the various branches of mathematical, physical, natural and economic science, with special reference to their applications in the industries of life, and to the facilities for such instruction." *Id.* § 1, 26 Stat. at 418.

The Second Morrill Act also forbade payment of funds appropriated under the Act to colleges "where a distinction of race or color is made in the admission of students." *Id.* This prohibition, however, was qualified by a proviso deeming the establishment of a separate college for each race to be sufficient compliance if the funds were divided "equitably" between the two schools. *Id.* A second proviso described the mechanics of "separate but equal" compliance in greater detail:

> That in any State in which there has been one college established
> in pursuance of the [First Morrill Act], and also in which an educa-
> tional institution of like character has been established, or may be
> hereafter established, and is now aided by such State from its own

---

[3] The deadline for acceptance was two years from the date of the First Morrill Act's enactment. *Id.* § 5, 12 Stat. at 504 This deadline was extended to the later of July 23, 1869, or three years following a state's admission to the Union Act of July 23, 1866, ch 209, 14 Stat. 208.

revenue, for the education of colored students in agriculture and the mechanic arts . . . or whether or not it has received money heretofore under the act to which this act is an amendment, the legislature of such State may propose and report to the Secretary of the Interior a just and equitable division of the fund to be received under this act between one college for white students and one institution for colored students . . . which shall be divided into two parts and paid accordingly, and thereupon such institution for colored students shall be entitled to the benefits of this act and subject to its provisions, as much as it would have been if it had been included under the act of eighteen hundred and sixty-two, and the fulfillment of the foregoing provisions shall be taken as a compliance with the provision in reference to separate colleges for white and colored students.

*Id.*

*The Smith-Lever Act.* The Act of May 8, 1914, ch. 79, 38 Stat. 372 (codified as amended at 7 U.S.C. §§ 341-349) established and funded agricultural extension services "in connection with the college or colleges in each State now receiving, or which may hereafter receive, the benefits of the [First Morrill Act] . . . and the [Second Morrill Act]." *Id.* § 1, 38 Stat. at 372-73. As with the Second Morrill Act, the appropriations were payable to the States for disbursement. *Id.* § 4, 38 Stat. at 374. States having more than one eligible college were permitted to divide the appropriation as the legislature saw fit. *Id.* § 1, 38 Stat. at 373.

## B.

In 1863, the West Virginia Legislature assented to the provisions of the First Morrill Act. 1863 W. Va. Acts ch. 56. After passage of the Second Morrill Act, the West Virginia Legislature assented to its terms, designated West Virginia University as the beneficiary of the funds available under the First Morrill Act, and established State College as the beneficiary of a portion of the funds for the instruction of "colored" students. 1891 W. Va. Acts ch. 65, § 1.[4] West Virginia was among a group of seventeen states that ultimately complied with the Second Morrill Act's eligibility requirements by establishing a racially segregated land-grant college for black students.[5] The class of institutions thus established or designated by these seventeen states are commonly known as the 1890 colleges. The colleges in these same states that restricted enrollment to white students, as well as the

---

[4] State College was chartered as "The West Virginia Colored Institute." American Universities and Colleges 1822 (14th ed. 1992) In 1915, its name was changed to "The West Virginia Collegiate Institute " *Id* at 1823. In 1929, State College was given its present name. *Id*

[5] The other sixteen states were Alabama, Georgia, Florida, North Carolina, South Carolina, Virginia, Kentucky, Tennessee, Mississippi, Louisiana, Arkansas, Oklahoma, Texas, Missouri, Maryland, and Delaware *See Knight,* 787 F. Supp at 1168, Eddy, *supra* note 2, at 257-59.

non-segregated land-grant colleges in all other states, are commonly known as the 1862 colleges. *See Knight*, 787 F. Supp. at 1145 n.44, 1167-68.

In most states, there is only a single land-grant college, which receives all of the funds distributed to the state under the four statutes discussed in the preceding subpart. Even in states having both an 1862 and an 1890 college, the experiment station and extension service funded under the Hatch and Smith-Lever Acts, respectively, are almost uniformly located at the 1862 college, which consequently receives all of the appropriations provided pursuant to those two Acts. *See id.* at 1167-68.[6] Furthermore, according to Agriculture, no 1890 college receives First Morrill Act funds.[7] Consequently, with respect to the four statutes outlined above, the only funds that the 1890 colleges receive are a share of the Second Morrill Act appropriation.[8] Thus, except as altered by the 1890 derivative statutes, *see infra* Part I.C, the pattern of unequal distribution of federal funds (and of state funds as well) has remained little changed from the inception of the 1890 colleges.[9] In the mid-1950s, the Supreme Court held that the system of racially "separate but equal" state education (including higher education) was unconstitutional.[10] The end of *de jure* racial segregation raised the question whether there was a necessity for the continued participation of the 1890 colleges in the land-grant system. *See* Eddy, *supra* note 2, at 265-66 (1957). Thus, West Virginia complied with the Supreme Court's decisions by integrating both its 1862 college, West Virginia University, and its 1890 college, State College, and by consolidating the land-grant function in West Virginia University. State College was removed from the land-grant system. *See* 1957 W. Va. Acts ch. 72, John C. Harlan, *History of West Virginia State College 1891-1965*, at 101-04 (1968). The other sixteen states, however, did not fol-

---

[6] The exception is the State of Arkansas, whose experiment station is independent of both its 1862 and 1890 colleges. *See id* at 1168

[7] We understand that neither Agriculture nor the Department of Education (which administers the First Morrill Act) has records from which to ascertain the states' distribution of First Morrill Act funds. But Agriculture has indicated to us that it has no reason to believe that any 1890 college receives such funds

[8] Agriculture has provided us with the distribution of Second Morrill Act funds by states in fiscal year 1991 The grant to each state was $50,000, and for those states having an 1890 college, the portion of the grant that the 1890 college received ranged from a low of 6% ($3,125) in Missouri to a high of 50% ($25,000) in Florida and South Carolina The remainder of the Second Morrill Act appropriations in such states was given to that state's 1862 college All other states had only an 1862 college, which received the entire Second Morrill Act appropriation

[9] *See, e g , Knight,* 787 F. Supp at 1040-53, 1167-72; Eddy, *supra* note 2, at 257-66, Jean Preer, *"Just and Equitable Division" Jim Crow and the 1890 Land-Grant College Act,* 22 Prologue 323, 330-32, 334-36 (1990), Edmond, *supra* note 2, at 64, Williams, *supra* note 2, at 155-56, John R Wennersten, *The Travail of the Black Land-Grant Schools in the South, 1890-1917,* 65 Agric Hist 54, 62 (1991)

[10] *See, e g., Brown v Board of Education,* 347 U.S. 483 (1954); *see also Lucy v. Adams,* 350 U S 1 (1955) Prior to *Brown,* in cases all involving "the graduate school level, inequality was found in that specific benefits enjoyed by white students were denied to Negro students of the same educational qualifications " *Brown,* 347 U.S at 491-92 (citing *Missouri ex rel Gaines v Canada,* 305 U.S. 337 (1938); *Sipuel v Board of Regents,* 332 U S 631 (1948), *Sweatt v Painter,* 339 U S. 629 (1950); *McLaurin v Oklahoma State Regents.* 339 U S. 637 (1950)) These cases, however, did not reexamine the doctrine of "separate but equal" that had been set forth in *Plessy v Ferguson,* 163 U S. 537 (1896) *Brown,* 347 U S at 492 It was in *Brown* that the Supreme Court held, for the first time, "that in the field of public education the doctrine of 'separate but equal' has no place." *Id* at 495.

low West Virginia's approach. Although they formally ended discrimination on the basis of race or color in their land-grant college system, they nonetheless retained a dual system of historically white 1862 colleges and historically black 1890 colleges. *See Knight*, 787 F. Supp. at 1167-68. Furthermore, as indicated above, these states all continued their historical practice of allocating almost all land-grant funding to their 1862 college rather than to their 1890 college.[11]

## C.

Beginning in the 1970s, Congress enacted a series of statutes — the 1890 derivative statutes — that in terms authorized appropriations to be distributed directly by Agriculture to colleges eligible to receive funds under the Second Morrill Act. These were:

> * Agriculture Environmental and Consumer Protection Appropriation Act, 1972, Pub. L. No. 92-73, 85 Stat. 183, 186 (1971) (appropriating "payments for extension work by the colleges receiving the benefits of the second Morrill Act");

> * National Agricultural Research, Extension, and Teaching Policy Act of 1977 ("NARET"), Pub. L. No. 95-113, § 1444, 91 Stat. 913, 1007 (codified as amended at 7 U.S.C. § 3221) (authorizing appropriation of payments for "extension at colleges eligible to receive funds under the Act of August 30, 1890 (26 Stat. 417-419, as amended; 7 U.S.C. 321-326 and 328)");

> * NARET § 1445, 91 Stat. at 1009 (codified as amended at 7 U.S.C. § 3222) (authorizing appropriation of payments for "agricultural research at colleges eligible to receive funds under the Act of August 30, 1890 (26 Stat. 417-419, as amended; 7 U.S.C. 321-326 and 328)");

> * Agriculture and Food Act of 1981, Pub. L. No. 97-98, § 1433, 95 Stat. 1213, 1312 (codified as amended at 7 U.S.C. § 3223) (authorization, now expired, for grants for upgrading research equipment and facilities at the "institutions eligible to receive funds under the Act of August 30, 1890 (7 U.S.C. 321 et seq.)");

> * Food Security Act of 1985, Pub. L. No. 99-198, § 1416, 99 Stat. 1354, 1549 (codified as amended at 7 U.S.C. § 3224) (authorization, now expired, for grants for upgrading extension fa-

---

[11] An issue in *Knight* was whether Alabama's continued practice of favoring its 1862 land-grant college in the distribution of federal funds was a vestige of *de jure* racial segregation. The court concluded that it was not *Id.* at 1168, 1171-72

cilities at "institutions eligible to receive funds under the Act of August 30, 1890 (26 Stat. 417, chapter 841; 7 U.S.C. 321 et seq.)");

*   Food, Agriculture, Conservation, and Trade Act of 1990 ("FACT Act"), Pub. L. No. 101-624, § 1612(a), 104 Stat. 3359, 3721 (codified as amended at 7 U.S.C. § 3222a) (authorizing grants for agricultural research "at colleges eligible to receive funds under the Act of August 30, 1890 (7 U.S.C. 321 et seq.)");

*   FACT Act § 1612(b), 104 Stat. at 3722 (codified as amended at 7 U.S.C. § 3222b) (authorizing grants to upgrade agricultural and food sciences facilities and equipment "to assist the institutions eligible to receive funds under the Act of August 30, 1890");

*   FACT Act § 1612(c), 104 Stat. at 3723 (codified as amended at 7 U.S.C. § 3222c) (authorizing grants for national research and training centennial centers at colleges "eligible to receive funds under the Act of August 30, 1890 (7 U.S.C. 321 et seq.)").

Agriculture has construed these statutes as authorizing funding for the sole benefit of the 1890 colleges and has distributed the funds accordingly.

The Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-111, 107 Stat. 1046, ("FY 94 Appropriation"), appropriates for fiscal year 1994 the funds authorized by the 1890 derivative statutes. This law makes the following appropriations pursuant to the authorization statutes under consideration:

*Table 2*

| Dollar Amount | Authorization Statute | Description of Recipients in FY 94 Appropriation |
|---|---|---|
| $28,157,000 | NARET § 1445 (7 U.S.C. § 3222) | *"for payments to the 1890 land-grant colleges"* |
| $7,901,000 | FACT Act § 1612(b) (7 U.S.C. § 3222b) | *"payments to upgrade 1890 land-grant college research and extension facilities"* |
| $25,472,000 | NARET § 1444 (7 U.S.C. § 3221) | *"payments for extension work by the colleges receiving the benefits of the second Morrill Act"* |

*See* FY 94 Appropriation, 107 Stat. at 1051, 1053.

The first two appropriations listed in Table 2 limit the beneficiaries to the 1890 colleges. Because the FY 94 Appropriation is Congress's most recent enactment, its express narrowing of the beneficiary class supersedes any arguably broader language in the 1890 derivative statutes that authorized the appropriations. *See* General Accounting Office, *Principles of Federal Appropriations Law* 2-35 (2d ed. 1991) (a statutory authorization of appropriations is a directive from Congress to itself that Congress is free to alter in subsequent legislation actually appropriating the funds in question). Hence, none of the 1862 colleges could be eligible for those funds, regardless of our interpretation of the authorization contained in the 1890 derivative statutes.[12]

## II. ISSUES FOR RECONSIDERATION

In 1991, West Virginia enacted a law renewing its assent to the provisions of the Second Morrill Act and designating State College as the sole beneficiary of federal appropriations available under that Act. 1991 W. Va. Acts ch. 60.[13] As discussed above, State College was formerly an 1890 college. Its status as a land-grant college was withdrawn in 1957 as part of West Virginia's effort to desegregate its higher education system. Thus, the enactment in 1991 represents an attempt to restore State College's status after a hiatus of thirty-four years.

By current standards, the annual appropriation of $50,000 available to each state under the Second Morrill Act is not substantial. Request for Reconsideration, App. at 8-34. Significantly more funding is available, however, under the 1890 derivative statutes. West Virginia seeks funding for State College under both the Second Morrill Act and the 1890 derivative statutes.[14]

Agriculture contends that State College is not eligible for funding under either the Second Morrill Act or the 1890 derivative statutes.[15] Agriculture maintains that an institution may not receive Second Morrill Act appropriations unless it also receives funds under the First Morrill Act. Because West Virginia has not designated State College to receive funds under the First Morrill Act, (and State College does not in fact receive funds under that Act), Agriculture concludes that State College may not be designated to receive appropriations under the Second Morrill Act.

---

[12] The authorizations for appropriations contained in 7 U S C. §§ 3223 and 3224 have expired, and those contained in 7 U S C §§ 3222a and 3222c were not funded in the FY 94 Appropriation

[13] We express no opinion whether this statute was valid under the laws of West Virginia Agriculture has not questioned its validity on this ground

[14] Letter for Edward Madigan, Secretary of Agriculture, Department of Agriculture, from Gaston Caperton, Governor of West Virginia at 1, 2 (Mar 28, 1991)

[15] The recounting of Agriculture's position that follows is drawn from the Request for Reconsideration and from the Memorandum for Orville G Bentley, Assistant Secretary for Science and Education, Department of Agriculture, from A James Barnes, General Counsel, Department of Agriculture (Mar 11, 1983)

Agriculture acknowledges that State College was founded as an 1890 college, which the racial segregation proviso to the Second Morrill Act exempts from any requirement of receipt of First Morrill Act funds. Nevertheless, Agriculture maintains that because State College was withdrawn from the land-grant system, the only way to restore it is by the usual route requiring receipt of benefits under the First Morrill Act. Agriculture argues that the exception to that requirement — the racial segregation proviso — is unconstitutional, and hence, no longer available to West Virginia.[16]

Concerning State College's eligibility for funding under the 1890 derivative statutes, Agriculture contends that if State College fails to qualify for appropriations under the Second Morrill Act, it may not take advantage of the 1890 derivative statutes, which condition funding upon an institution's eligibility for appropriations under the Second Morrill Act. In addition, Agriculture denies that State College could qualify for funding under the 1890 derivative statutes even if it were eligible to receive appropriations under the Second Morrill Act. It notes that the class of colleges eligible for Second Morrill Act appropriations includes all the 1862 colleges that receive appropriations under the First and Second Morrill Acts. But, Agriculture contends, Congress did not intend to benefit every such school. Rather, Congress intended to benefit only a specific group of sixteen historically black colleges in the land-grant system at the time that the 1890 derivative statutes were enacted (and also the historically black Tuskegee University, which is not a land-grant college). Agriculture invokes legislative history on this point, which it urges must guide the interpretation of the statutory language. Thus, in Agriculture's view, even assuming that State College could now be designated to receive First Morrill Act funds, it nevertheless could not qualify for funding under the 1890 derivative statutes, because it is not among the schools that Congress intended to benefit.

This Office's original opinion (superseded by this one) agreed with West Virginia. We concluded that a state may designate an institution for Second Morrill Act appropriations without designating it for First Morrill Act funds if the school meets the educational requirements of the First Morrill Act and the non-discrimination requirement of the Second Morrill Act. We further concluded that the plain language of the 1890 derivative statutes could not be restricted by the

---

[16] The proviso is indeed unconstitutional *See supra* note 10 and accompanying text In reading the proviso out of the Second Morrill Act, Agriculture implicitly assumes that it is severable from the remainder of that Act We agree with that proposition as well *See Alaska Airlines, Inc. v. Brock*, 480 U S. 678, 684 (1987) (standard for determining severability)

Subsequent to our original opinion, the American Law Division of the Congressional Research Service ("ALD") has advised that "redesignation" of State College remains possible today under the Second Morrill Act, notwithstanding the unconstitutionality of the racial segregation proviso *See* Memorandum from American Law Division, Congressional Research Service, Library of Congress, *Re: Validity of the Second Morrill Act in Light of Brown v Board of Education* at 3 (Sept. 20, 1991). The ALD opinion does not, however, address the question whether an institution must receive First Morrill Act funds in order to qualify for Second Morrill Act funds, nor does it construe the 1890 derivative statutes

legislative history, and, thus, that West Virginia could qualify for such appropriations after having been designated to receive Second Morrill Act funds.

Agriculture has now asked that we reconsider both of these conclusions. It advances certain textual arguments concerning the Second Morrill Act to bolster its reading of that Act. With respect to the 1890 derivative statutes, Agriculture insists that we must avoid a result that is both absurd in itself and at odds with clear legislative history. Agriculture emphasizes that a decision that State College may share in funding under the 1890 derivative statutes carries potentially broad implications. The language of these statutes seemingly encompasses *all* schools eligible to receive Second Morrill Act appropriations, including the 1862 institutions. Thus, says Agriculture, "[i]f your opinion were adopted, a minimum of 74 institutions [i.e., all land-grant colleges and Tuskegee University] would become eligible for the [funding] that is now distributed among 17 institutions [i.e., only the 1890 colleges and Tuskegee University]." Request for Reconsideration at 7 Obviously, this outcome would considerably lessen the share of funds given to the 1890 colleges. According to Agriculture, this outcome is absurd because the very purpose of the 1890 derivative statutes, as shown by the legislative history, was to remedy a historical inequity: the states that had maintained racially segregated systems had given almost all land-grant funding to their 1862 colleges while excluding the 1890 colleges from the federal bounty. Consequently, Agriculture concludes that the 1890 derivative statutes must be read to authorize appropriations only for the benefit of the 1890 colleges.

## III.
## STATE COLLEGE'S ELIGIBILITY FOR FUNDS
## UNDER THE 1890 DERIVATIVE STATUTES

On reconsideration, we conclude that the 1890 derivative statutes provide appropriations only for the benefit of the 1890 colleges. Furthermore, we find that State College is not among the intended beneficiaries. Because we think that State College's eligibility for appropriations under the Second Morrill Act does not control its eligibility for appropriations under the 1890 derivative statutes, we leave consideration of the Second Morrill Act to Part IV, *infra*.

### A.

Our analysis of the 1890 derivative statutes is guided by a longstanding rule of construction very recently reiterated by a unanimous Supreme Court:

> Over and over we have stressed that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and

policy." *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122 (1849) (quoted in more than a dozen cases, most recently *Dole v. Steelworkers,* 494 U.S. 26, 35 (1990)); *see also King v. St. Vincent's Hospital,* 502 U.S. 215,221 (1991). . . . Statutory construction "is a holistic endeavor," *United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371 (1988), and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.

*National Bank of Or. v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 455 (1993). All aspects of a statute, including its title, may be consulted in order to determine the congressional intent. *See id.* (consulting title).

It is undisputed that, from the time of the Second Morrill Act's enactment in 1890 to this day, the colleges eligible to receive funds under that Act have included both the 1862 colleges and the 1890 colleges. Indeed, as indicated above, the Second Morrill Act was passed in large part for the specific benefit of the 1862 colleges. On their face, however, the 1890 derivative statutes fail to distinguish between the class of colleges eligible for Second Morrill Act funds, including both the 1862 colleges and the 1890 colleges, and the more restricted class of 1890 colleges. For example, although NARET § 1444 is entitled "Extension at 1890 Land-Grant Colleges," 91 Stat. at 1007, the body of § 1444 creates a permanent authorization for Congress "to . . . appropriate[] annually such sums as Congress may determine necessary to support continuing agricultural and forestry extension at *colleges eligible to receive funds under the [the Second Morrill Act]." Id.* (emphasis added). Similarly, NARET § 1445 is entitled "Agricultural Research at 1890 Land-Grant Colleges;" the substantive text of § 1445, however, authorizes annual appropriations of "such sums as Congress may determine necessary to support continuing agricultural research at colleges *eligible to receive funds under the [Second Morrill Act]."* 91 Stat. at 1009 (emphasis added). Thus, were we to consider the substantive provisions of the 1890 derivative statutes alone, without reference to the titles, the legislative history, the other portions of the statutory text, or the structure and purpose of the overall statutory scheme for the land-grant colleges, we would be forced to conclude that those provisions benefited 1862 and 1890 colleges alike.

Such a conclusion would, however, be at odds with the unmistakable purpose of the 1890 derivative statutes. That purpose is to rectify the historical imbalance of funding between the 1862 and 1890 colleges — an imbalance that originated in racial segregation. The House Report concerning § 1444 of NARET described its purpose as follows:

> The committee intends that the 1890 land-grant colleges . . . become partners in the Department's agricultural research effort in the

> food and agricultural sciences. . . . [T]he research capacity in the food and agricultural sciences at the 1890's . . . is not as great as the agricultural research capacity of many of the 1862 schools. However, it must be emphasized that very few of the 1890 schools . . . receive any state funding, and Federal funding for agricultural research, which has not been on a permanent basis but rather on a grants basis, has only been available to the 1890's . . . since 1967. Permanent funding for agricultural research has been available to the state agricultural experiment stations of the 1862 institutions since 1887.

H.R. Rep. No. 95-348, at 122 (1977) ("House Report").

During hearings concerning § 1433 of the Agriculture and Food Act of 1981, the need for the bill was put as follows:

> This Congress has been supporting agricultural research for a long time. As far back as 1862, Congress set up the land grant college system. Over the years, the institutions created under the 1862 Act have been helped to build research programs which are the envy of the world.
>
> Later, in 1890, Congress passed a second Morrill Act which was designed specifically to support black land grant institutions. . . .
>
> These institutions, which were originally created under the old separate-but-equal doctrine, have had to make do with inadequate state funding and little or no federal funding in the past for research, teaching and extension. Their achievements with limited resources have been tremendous, but . . . there is a limit to the number of bricks a man can make without straw. The 17 institutions we are dealing with need help now to bring their food and agricultural research facilities up to acceptable levels.
>
> The 1890 colleges need, simply, to catch up. That is what H.R. 1309 is designed to help them do.

*1890 Land-Grant Colleges Facilities: Hearings on H.R. 1309 Before the Subcomm. on Department Operations, Research, and Foreign Agriculture of the House Comm. on Agriculture*, 97th Cong. 8-9 (1981) ("House Hearing") (prepared statement of Rep. de la Garza); *see also id.* at 13-17 (prepared statement of Rep. Ford) (contrasting historically "meager funding" by the states and the federal government for the 1890 colleges with the "royal treatment" provided for the 1862 colleges, and asserting that H.R. 1309 would provide "'catch-up'" funds to the 1890 colleges "for years of past neglect").

In drafting the 1890 derivative statutes to benefit the 1890 colleges, however, Congress conflated two distinct classes: colleges eligible to receive Second Morrill Act funds, and the 1890 colleges. Thus, with respect to NARET §§ 1444 and 1445, both the Conference and the House Reports use the description "colleges eligible to receive funds under the [Second Morrill Act]" interchangeably with "1890 institutions." *See, e.g.,* S. Conf. Rep. No. 95-418, at 225-28 (1977) ("Conference Report"); House Report at 123-24. In fact, of course, the terms are not interchangeable, because all of the 1862 colleges, as well as the 1890 colleges, receive Second Morrill Act funds. Congress also understood the class of 1890 colleges to consist wholly of sixteen identified, historically black schools. *See, e.g.,* H.R. Rep. No. 97-151, at 3 (1981) (enumerating the sixteen 1890 colleges).[17]

It appears that Congress intended to fund only the sixteen identified 1890 colleges, and mistakenly assumed that only they were eligible for Second Morrill Act funds. The Conference and House Reports specifically contrast the 1890 colleges with the 1862 colleges, thus showing that Congress understood the distinction between the two classes, even though it supposed that only the former class was eligible for Second Morrill Act appropriations. *See* Conference Report at 225-27; House Report at 122. Thus, the legislative history suggests that NARET §§ 1444 and 1445 were intended to authorize appropriations only for the 1890 colleges.[18]

References to unenacted materials evidencing Congress's intent would not alone be sufficient to control the enacted language of NARET §§ 1444 and 1445, even if those materials demonstrated that the statutory language Congress adopted derived from a mistake of fact or law. *See INS v. Chadha,* 462 U.S. 919, 944-51 (1983) (holding that passage by House and Senate and presentment to President are pre-

---

[17] In addition to the sixteen 1890 colleges, Congress explicitly named Tuskegee University -- which does not receive Second Morrill Act funds -- as a beneficiary in each of the 1890 derivative statutes, bringing the total number of beneficiaries to seventeen schools. Like the other sixteen colleges, Tuskegee University is a historically black institution *See Knight,* 787 F Supp at 1086-89, 1093

[18] Congress's assumption, that only the 1890 colleges receive the benefits of the Second Morrill Act, is widely shared. *See Knight,* 787 F. Supp at 1145 (finding based on expert testimony that "[t]here is a popular misconception that the 1890 land grant colleges . got all the money authorized by [the Second Morrill Act]"). Indeed, both the judiciary and the executive branch have made the same mistake *See Avers v. Allain,* 674 F Supp 1523, 1543 (N D. Miss. 1987) (court erroneously describes Mississippi's 1890 institution as "*the* land-grant institution designated by the state to receive funds pursuant to the second Morrill Act"), *aff'd,* 914 F.2d 676 (5th Cir 1990) (en banc), *vacated sub nom , United States v. Fordice,* 505 U S 717 (1992) (emphasis added); Conference Report at 227 (reproducing letter from the Secretary of Agriculture that comments on House draft of the provisions that ultimately became §§ 1444 and 1445 and shows that he shared the assumption of the drafters that the class of beneficiaries would be exclusively the 1890 colleges, notwithstanding that the text of the draft bill defined the eligible class as those colleges eligible to receive Second Morrill Act funds)

The source of confusion may be that the historically black land-grant colleges are the only land-grant institutions established under the Second Morrill Act, and they are called the "1890 colleges," which heightens the impression that they were the principal beneficiaries of the Second Morrill Act *See, e g ,* House Hearing at 8-9 (prepared statement of Rep. de la Garza) ("[I]n 1890, Congress passed a second Morrill Act *which was designed specifically to support black land grant institutions.*") (emphasis added); Preer, *supra* note 9, at 323 ("It is ironic . . that the Second Morrill Act, finally passed in 1890 and still in effect a century later, is now known for its incidental beneficiaries, black land-grant colleges. . . . These colleges are what we now call the '1890 colleges '") (footnote omitted)

requisites of valid legislation); *Gray v. United States*, 76 F. Supp. 102, 104 (Ct. Cl. 1948) (holding that courts "have no power to, in effect, reform statutes because Congress, in writing them, labored under a misapprehension as to facts or law"). Our obligation, however, is to give meaning and effect to the entirety of the relevant statutory texts, and we can do so here only if we assume that the 1890 derivative statutes were designed for the sole benefit of the 1890 colleges. An interpretation of NARET §§ 1444 and 1445 that takes those provisions to refer only to the 1890 colleges is the only reading of the statute that can account for the "full text, language[,] . . . structure, and subject matter." *National Bank of Or.*, 508 U.S. at 455.

As detailed below, this understanding of the 1890 derivative statutes helps explain certain provisions in those enactments that otherwise would remain anomalous. Although these anomalies do not necessarily rise to the level of intrinsic textual ambiguity, nor do they create patently absurd results, our ability to explain them provides some assurance that our use of legislative history has contributed to a proper understanding of the text.[19]

The first anomaly has to do with the computation of funding authorized by NARET §§ 1444(a) and 1445(a). In § 1444(a), it is keyed to a percentage of the amount of funds appropriated for extension work under the Smith-Lever Act. *See* 91 Stat. at 1007. Likewise, in § 1445(a), research funds are authorized in an amount based upon a percentage of the level of funds appropriated for agricultural research under the Hatch Act. *See id.* at 1009. As noted above, however, every state has given its Smith-Lever and Hatch Act funds exclusively to its 1862 college and experiment stations controlled exclusively by those schools (except Arkansas, which has an independent experiment station). If §§ 1444 and 1445 are designed to rectify the states' historic discrimination between the 1862 and 1890 colleges, these funding mechanisms would have a discernible purpose. But if §§ 1444 and 1445 are read to benefit the 1862 colleges as well as the 1890 colleges, then Congress would have created a (much smaller) duplicate mechanism to fund research and extension at colleges already receiving appropriations for these purposes under the Smith-Lever Act and the Hatch Act. It also seems unlikely that when Congress provided "catch up" funds for the 1890 colleges, it did so by appropriating still more funds for the 1862 colleges already acknowledged to be receiving the lion's share of state and federal land-grant funding. It is more consonant with the statu-

---

[19] *See Reich v. Great Lakes Indian Fish and Wildlife Comm'n*, 4 F.3d 490 (7th Cir 1993) There, the court suggested that one may "seek meaning beneath the semantic level not only when there is an 'intrinsic' ambiguity but also when there is an 'extrinsic' one, that is, when doubt that the literal meaning is the correct one arises only when one knows something about the concrete activities intended to [be] regulate[d]." *Id.* at 494. Thus. "A literal reading of the Fair Labor Standards Act would create a senseless distinction between Indian police and all other public police Nothing in the Act alerts the reader to the problem; you have to know that there are Indian police to recognize it But once it is recognized, the Act, viewed as a purposive, rational document, becomes ambiguous, creating room for interpretation We cannot think of any reason other than oversight why Congress failed to extend the law enforcement exemption to Indian police [and] no reason has been suggested to us." *Id.*

tory purpose to read the 1890 derivative statutes as appropriating funds solely for the 1890 colleges.

A second anomaly occurs in NARET § 1444(c), which contains presuppositions that make sense only if § 1444 is read to apply solely to the 1890 colleges. Subsection (c) provides: "The State director of the cooperative extension service and the administrative head for extension at the eligible institution in each State where an eligible institution is located shall jointly develop, by mutual agreement, a comprehensive program of extension for such State." 91 Stat. at 1008. As mentioned, every state has an extension service created under the Smith-Lever Act and attached to that state's 1862 college. This subsection, however, contemplates that *not* every state has an eligible institution (making it necessary to include the phrase "where an eligible institution is located"). It also presupposes a distinction between the statewide extension program and the extension program at an eligible institution, whose administrative heads are instructed to work "jointly." These presumptions do not make sense if § 1444 is read to include the 1862 colleges, which have extension programs. They make sense, however, if § 1444 is read to establish a new extension program for the exclusive benefit of the 1890 colleges, which are found only in sixteen states and do not have an extension program under the Smith-Lever Act. Indeed, the Conference Report confirms that the purpose of subsection (c) is to coordinate the extension program newly created under § 1444 at each 1890 college with the existing extension program at the 1862 college located in the same state. Conference Report at 226-27; *see also* House Report at 122 ("[T]he committee wishes to stress its desire that the agricultural research conducted at the 1890's . . . and the involved 1862 institutions not be duplicative.").

A third anomaly appears in § 1433(a) of the Agriculture and Food Act of 1981, which is opaque unless read to benefit only the 1890 colleges. It states:

> It is hereby declared to be the intent of Congress to assist the institutions eligible to receive funds under the [Second Morrill Act] . . . in the acquisition and improvement of research facilities and equipment so that eligible institutions may participate fully with the State agricultural experiment stations in a balanced attack on the research needs of the people of their States.

95 Stat. at 1312. As has been indicated, no state has more than one agricultural experiment station, and all (but one) of these are under the control of an 1862 college that receives Second Morrill Act benefits. Section 1433(a) cannot refer to both the 1862 and 1890 colleges because that would mean that the 1862 colleges in states without 1890 colleges are to "participate fully" *with themselves* in performing agricultural research. Thus, the text makes sense only if the eligible institutions are understood as a class separate from the existing state agricultural experiment stations. Properly construed, the section reflects once again the congressional pur-

pose of providing additional funding to the 1890 colleges to restore "balance[]" in the allocation of federal funds between the 1862 and 1890 colleges, thus rectifying a perceived imbalance that had prevented the 1890 colleges from "participat[ing] fully" in agricultural research.

The very same analysis applies to the language of § 1416(a) of the Food Security Act of 1985, 99 Stat. at 1549, setting forth a declaration of congressional intent in authorizing grants to upgrade cooperative extension facilities. The title of § 1416, moreover, is "Grants to upgrade 1890 land-grant college extension facilities." *Id.*

In sum, a number of anomalies disappear when the 1890 derivative statutes are read as benefiting solely the 1890 colleges. There are, moreover, aspects of the 1890 derivative statutes that affirmatively support such a reading. First, it is significant that all of the 1890 derivative statutes allocate funds not to the states, as is true of the earlier land-grant statutes, but directly to the eligible institutions.[20] The legislative history indicates that Congress understood this structure as a departure from prior practice with respect to the 1862 colleges. *See* Conference Report at 226 (rejecting a Senate bill provision that would have provided that the states "act as intermediaries with respect to the extension programs between the 1890 institutions and the Secretary of Agriculture in the same manner as currently exists for 1862 institutions" in favor of a House amendment that provided for a direct relationship between the 1890 institutions and the Secretary). This difference in structure is consistent with the expressed purpose of the 1890 derivative statutes to rectify an imbalance of funding brought about largely by the discriminatory action of the states in their allocation of federal (and state) funds.

Second, as noted above, the titles of most of the 1890 derivative statutes expressly refer to funding for the 1890 colleges. *See, e.g.,* NARET § 1444, 91 Stat. at 1007 ("Extension at 1890 land-grant colleges"); FACT Act § 1612(b), 104 Stat. at 3722 ("Grants to upgrade agricultural and food sciences facilities at 1890 land-grant colleges"). The titles provide strong textual evidence that the 1890 derivative statutes are designed to benefit only the 1890 colleges.

Finally, the sums appropriated pursuant to the 1890 derivative statutes are much smaller than those appropriated pursuant to the earlier land-grant statutes. For example, the FY 94 Appropriation provides the 1862 colleges and experiment stations with $272,582,000 in Smith-Lever Act funding for extension work and $171,304,000 in Hatch Act funding for research. In contrast, it provides only $25,472,000 for extension work pursuant to NARET § 1444 and $28,157,000 for research pursuant to NARET § 1445. *See* 107 Stat. at 1051, 1053. In each case, if the NARET funds were divided over seventy-four schools (the combined total of the 1862 and 1890 colleges and Tuskegee University), no school would derive

---

[20] Although the Hatch Act provides for disbursement of funds by the federal government directly to the beneficiaries, the states effectively each choose the beneficiary, and the appropriation is said to be "to each State " 24 Stat. at 441

much benefit from its share of funds and the amount received by an 1862 college would be minuscule relative to the funds that each such college will receive for essentially the same purposes pursuant to the Smith-Lever and Hatch Acts. These circumstances suggest that the congressional intent was not to divide the 1890 derivative funds among all the land-grant colleges, but only among the 1890 colleges. *See Rose v. Rose*, 481 U.S. 619, 630-31 (1987) (employing division of appropriations among beneficiaries to determine meaning of statute).

Our examination of the FACT Act § 1612, 104 Stat. at 3721, as well as its legislative history, confirms that Congress continued to equate the colleges eligible to receive benefits under the Second Morrill Act with the 1890 colleges. *See, e.g.,* H.R. Conf. Rep. No. 101-916, at 1047-48 (1990). The same is true of the FY 94 Appropriation, 107 Stat. at 1051-53, and its legislative history. *See, e.g.,* H.R. Rep. No. 103-153, at 29, 40 (1993); S. Rep. No. 103-102, at 29, 40-1 (1993). Thus, the class of intended beneficiaries has not changed.

## B.

Having concluded that Congress intended the phrase "eligible to receive funds [under the Second Morrill Act]" to refer solely to the 1890 colleges, we must determine whether State College falls within this class. Congress understood this class to encompass a specific list of sixteen identified schools (to which was added the Tuskegee Institute). *See, e.g.,* H.R. Rep. No. 97-151, at 3 (1981) (listing the 1890 colleges). Because State College was not among the identified schools, it would seem that it may not share in 1890 derivative funding.

Congress's list of 1890 colleges, moreover, likely was drawn from the general understanding of the term "1890 college" as a category encompassing historically black land-grant colleges with a common genesis in the Second Morrill Act. Originally, State College was commonly understood to be among this group. Because State College was withdrawn from the land-grant system, however, it lost its standing as an 1890 college. Thus, when the 1890 derivative statutes were passed, this term was no longer commonly understood to include State College.[21] State College, therefore, was not (and could not have been) among the intended beneficiaries of those statutes.

It might be argued nonetheless that West Virginia's putative restoration of State College to the land-grant system also restored it to the category of 1890 colleges.[22] West Virginia took this action in 1991, prior to the 1993 enactment of the FY 94

---

[21] *Compare, e.g ,* Eddy, *supra* note 2, at 258-59 (1957) (State College included among the 1890 colleges) *with, e g.,* Edmond, *supra* note 2, at 63 (1978) (State College absent from list of the 1890 colleges otherwise drawn from Eddy's book).

[22] This may be the basis of West Virginia Governor Caperton's suggestion that West Virginia's 'redesignation" of State College under the Second Morrill Act makes it eligible for 1890 derivative funding *See* Letter for Edward Madigan, Secretary of Agriculture, Department of Agriculture, from Gaston Caperton, Governor of West Virginia at 2 (Aug. 9, 1991).

Appropriation. Therefore, we cannot *a priori* exclude the possibility that, at the time the FY 94 Appropriation was enacted, either Congress believed that State College was once again an 1890 college or, in a more general sense, that "1890 college" as a term of art once again included State College. The Appropriation's legislative history, however, does not offer any discussion as to what schools Congress thought were among the 1890 colleges.[23] Furthermore, the general usage does not appear to have changed.[24] In light of the previous congressional belief (as well as the general understanding among those using the term) that State College was not one of the 1890 colleges, this silence is tantamount to not recognizing State College's restoration as an 1890 college.[25] Consequently, we conclude that the reference to 1890 colleges in the FY 94 Appropriation does not include State College. Accordingly, State College may not share in the funds appropriated in the FY 94 Appropriation pursuant to the authorizations contained in the 1890 derivative statutes.

## IV.
## STATE COLLEGE'S ELIGIBILITY FOR FUNDS
## UNDER THE SECOND MORRILL ACT

We turn now to the question posed by Agriculture's Request for Reconsideration whether a land-grant college may receive Second Morrill Act appropriations if it does not receive funds under the First Morrill Act.

The Second Morrill Act provides an annual appropriation of funds "to each State . . . for the more complete endowment and maintenance of colleges for the benefit of agriculture and the mechanic arts now established, or which may be hereafter established, in accordance with [the provisions of the First Morrill Act]." *Id.* § 1, 26 Stat. at 417-18. Agriculture construes this general language to condition the eligibility of a college to receive funds under the Second Morrill Act upon its designation as a recipient of First Morrill Act funds. In our original opinion, we reached the opposite conclusion, construing this language to impose only a requirement that a college conform to the educational requirements of the First Morrill Act (and the non-discrimination requirement in the Second Morrill Act).

In light of our conclusions in Part III, *supra*, this issue does not have any bearing on the question of whether State College (or any college) may qualify for

---

[23] *See, e g ,* H R Rep No. 103-153, at 29, 40, S Rep. No. 103-102, at 29, 40 Nor is there such a discussion in the legislative history accompanying Agriculture's appropriation bill for fiscal year 1993. *See, e g ,* H R Rep No 102-617, at 41 (1992), S Rep No 102-334, at 40 (1992).

[24] *See, e g , Knight v. Alabama,* 787 F Supp at 1168 (West Virginia absent from list of states having 1890 institutions), *A Century of Service Land-Grant Colleges and Universities, 1890-1990* xx, 15 (Ralph D Cristy & Lionel Williamson eds , 1992) (notes that West Virginia founded State College as a black land-grant college but later rescinded land-grant status; omits State College from list of 1890 colleges).

[25] *See Walton v. United Consumers Club, Inc ,* 786 F 2d 303, 310 (7th Cir 1986) ("[B]ecause the purpose of language is to use *shared* understandings, meanings held by both writer and reader, a court may not assume that Congress picked an unusual meaning unless some evidence supports that interpretation.").

funding under the 1890 derivative statutes. Moreover, we note that there are no restrictions on the division of funds between schools eligible for First Morrill Act funds. *See infra* note 27 and accompanying text. Therefore, as Agriculture has acknowledged, West Virginia "could meet the threshold of 1862 designation by giving State College one dollar of 1862 monies per year." Request for Reconsideration at 10. Furthermore, as indicated earlier, the annual appropriation for each state under the Second Morrill Act is not large by today's standards. These considerations substantially reduce the practical importance of any decision on this issue. Nonetheless, since State College's eligibility for Second Morrill Act funding remains in dispute, we will reconsider the issue. We conclude that, although the question is a close one, the balance of the evidence favors our original view.

The legislative history of the Second Morrill Act suggests that Congress believed that the appropriated funds would in fact be used to supplement the funds available to the land-grant colleges and departments that had been established by the states pursuant to the First Morrill Act.[26] Furthermore, the development of the land-grant system has indeed followed this course. Except for the 1890 colleges, only colleges receiving the benefits of the First Morrill Act have been designated by their respective states to receive appropriations under the Second Morrill Act. Nonetheless, in our original opinion, we took the view that the statutory language did not specifically mandate that the states allocate Second Morrill Act funds only to colleges already endowed with First Morrill Act funds if a state (such as West Virginia) wished to do otherwise.

In support of our original construction of the Second Morrill Act, these kinds of considerations may be cited: the statutory scheme, the contrast with the language of a similar statute, the longstanding practice of those administering the Act, and judicial construction of it. First, the existence of such a specific limitation seems at odds with the statutory scheme, which vests the states with very broad power to allocate Second Morrill Act appropriations to institutions of their choosing. Thus, the Supreme Court in *Wyoming ex rel. Wyoming Agric. College v. Irvine*, 206 U.S. 278, 284 (1907), summarized the plenary nature of the states' power over First and Second Morrill Act funds as follows: "the fund and its interest [under the First Morrill Act] and the annual appropriations [under the Second Morrill Act] are the property of the State and not of any institution within it."[27] This statutory scheme renders the proposed limitation virtually superfluous because, as Agriculture con-

---

[26] *See, e.g* , S Rep No. 51-1028, at 1-2 (1890); H R. Rep No. 51-2697, at 1, 2, 4-6 (1890).

[27] A state may select one or more schools as beneficiaries of First and Second Morrill Act funds, allocate the funds as it chooses among qualified beneficiaries, and withdraw the designation of a previously selected school. *See, e g* , *State ex rel Moodie v. Bryan*, 39 So 929, 951 (Fla. 1905) (holding that state has full power over disposition of appropriation and may withdraw it from an institution already receiving a share), *Massachusetts Agric. College v Marden*, 30 N.E. 555, 557 (Mass. 1892) (holding that states may divide the Second Morrill Act appropriation among schools, they are not restricted in the number of beneficiaries except in states practicing racial segregation, which are required to have no more than one school for each race).

cedes, a state may qualify a school for Second Morrill Act appropriations by allocating to it but one dollar of First Morrill Act funds.[28]

A second consideration is the difference in language between the Second Morrill Act and the Smith-Lever Act of 1914. The Smith-Lever Act follows the structure of the Second Morrill Act in giving appropriated funds to the states. 38 Stat. at 373. It expressly provides, however, that the states must allocate the appropriated funds for extension work at "the college or colleges in each State now receiving, or which may hereafter receive, the benefits of the [First Morrill Act] . . . and of the [Second Morrill Act]." *Id.* Thus, Congress knew how to impose this type of requirement in clear language when it wished to do so. The contrasting absence of an explicit requirement in the Second Morrill Act tends to show that none was intended.

A third consideration is that Agriculture to this day has permitted the states to continue giving Second Morrill Act appropriations to the 1890 colleges without requiring that they receive First Morrill Act funds, notwithstanding the invalidity of the racial segregation proviso. *See supra* note 10 and accompanying text. Without the benefit of the exemption contained in that proviso, however, all of the 1890 colleges should have been subject to what Agriculture takes to be the requirement that they receive First Morrill Act funds, to the same extent as if they were 1862 colleges. Thus, Agriculture's administration of the Second Morrill Act does not support its position with respect to State College.

Finally, the judicial decisions construing the Second Morrill Act support our construction of the Act, although we agree with Agriculture that they are not dispositive of the precise question at issue. The cases concerning requirements for receipt of First and Second Morrill Act funds have focused on the type of education to be provided by a college in order to be eligible for such funds. *See Marden*, 30 N.E at 556-57 (holding that a college may receive First and Second Morrill Act funds if it is of the type specified in the First Morrill Act); *In re Agric. Funds*, 21 A. 916, 917 (R.I. 1890) (holding that the failure of Rhode Island's agricultural school to teach the mechanic arts disqualified it from Second Morrill Act funds that were intended "'for the benefit of agriculture *and* the mechanic arts.'") (emphasis added) (quoting the First Morrill Act, § 4, 12 Stat. at 504); *State ex rel. Wyoming Agric. College v. Irvine*, 84 P. 90, 100 (Wyo. 1906) (summarizing *In re Agric. Funds* as a decision that "held . . . that a mere agricultural school was not within the contemplation of the [First and Second Morrill Acts]"), *aff'd.* 206 U.S. 278 (1907). These decisions do not say that receipt of First Morrill Act funds is a prerequisite for eligibility for Second Morrill Act appropriations. On the other hand, neither *Marden* nor *In re Agric. Funds* holds squarely that a college may

---

[28] Moreover, Congress's evident purpose in the First and Second Morrill Acts was to promote a certain type of educational institution -- i e, "colleges devoted to agriculture and the mechanic arts.' Agriculture's requirement -- that a school receive First Morrill Act funds -- does not advance this purpose to any greater degree than our construction, which requires that any school eligible to receive Second Morrill Act funds also conform to the educational requirements imposed by the First and Second Morrill Acts

receive Second Morrill Act funds even if it does not receive First Morrill Act funds. In *Marden*, Massachusetts Institute of Technology in fact was receiving both. In *In re Agric. Funds*, the court denied the state agricultural college eligibility for Second Morrill Act funds.[29]

Agriculture nonetheless contends that the statute does require that any college receiving Second Morrill Act appropriations have been designated for First Morrill Act funds. Agriculture infers this requirement primarily from the recitation that the Second Morrill Act's appropriations are "for the more complete endowment and maintenance" of the land-grant colleges. The suggestion is that the words "more complete" imply that the states are required to use these funds solely to supplement the endowment of schools receiving First Morrill Act funds. Agriculture reinforces this point by noting that the First Morrill Act requires states to "take and claim the benefit" for "at least one college." 12 Stat. 504. Under the terms of the First Morrill Act, a state failing to designate at least one beneficiary would forfeit its benefit entirely under that Act, *id.* at 504-05, without which no institution could be "more complete[ly] endowed" under the Second Morrill Act. In light of the considerations discussed above, we doubt that the very general language concerning the purpose of the Second Morrill Act can support the construction that Agriculture has placed upon it.

The text of the Second Morrill Act, however, lends support to Agriculture's view for another reason. The Second Morrill Act's (invalid) racial segregation proviso deemed the establishment of institutions for "colored students" to be compliance with the proviso that forbade discrimination in the admission of students based on race or color. It did so by authorizing states having a college "established in pursuance of [the First Morrill Act]" to establish (if they had not already done so) an institution "of like character" for black students, "whether or not it has received money heretofore under the [First Morrill Act]." 26 Stat. at 418. This limited exemption of schools for "colored students" from receipt of First Morrill Act funds would seem to imply a congressional understanding that schools receiving appropriations under the Second Morrill Act and not established under the proviso be otherwise subject to the requirement of receiving of First Morrill Act funds.

Some pertinent legislative history also substantiates Agriculture's view. Most relevant is a floor exchange between Senator Hoar and Senator Blair. During a discussion of the draft bill, Senator Hoar suggested that the bill ought to, but did not, allow states to allocate the appropriated benefits to an institution devoted to the agriculture and mechanic arts "which did not receive the benefit of the original

---

[29] Rhode Island's agricultural school was not a recipient of First Morrill Act funds (only Rhode Island's Brown University appears to have been specifically so designated) Thus, the court could have disqualified the agricultural school from Second Morrill Act appropriations on this ground alone, if it had read that Act in the manner that Agriculture proposes. That the court denied the agricultural school Second Morrill Act appropriations for an entirely different reason, which was the school's failure to teach the mechanic arts, supports the view that there is no requirement that a school receive First Morrill Act funds in order to eligible for designation as a Second Morrill Act beneficiary. *See* 21 A at 917

benefaction." 21 Cong. Rec. 6086 (1890). He suggested that the bill be amended to rectify this perceived deficiency. Senator Blair — who was answering questions and objections from the Senators concerning the bill — asserted initially that the bill did not require amendment because it "meets . . . the suggestion[] of [Senator Hoar] as it now is." *Id.* This initial response implied that the bill did not require colleges to receive First Morrill Act funds in order to be eligible for the new appropriation. When Senator Hoar expressed skepticism that the bill met his concerns, however, Senator Blair elaborated as follows:

> It was not the understanding of the committee that we were recommending an annual appropriation for an indefinite number of colleges which might hereafter come to be established. Meritorious colleges undoubtedly will be established including the same subject matter; but it was thought that the States where these colleges are should receive a certain specific amount, $15,000 a year, and let them appropriate that money, as they necessarily must now, to the single agricultural college that exists in each State.

> If there should be subsequently from those same funds — and I do not see how it can be done, for the whole amount that was realized from the lands under that act is already invested in every State — but if it is conceivable that they should be subdivided and those institutions multiplied with the funds already in the possession of the State, then let them divide this annual appropriation for the support of several if they see fit, but otherwise let it be concentrated upon a single one of the institutions. However, they must be institutions which derive their vitality from the original act of Congress making appropriations of the public lands. The nation itself certainly ought not to be dragged beyond what originates in that specific act of Congress in the way of support of the agricultural colleges and those of the mechanic arts which the States may see fit to multiply among themselves hereafter.

*Id.* at 6087. This statement suggests that Senator Blair viewed the Second Morrill Act as prohibiting states from allocating funds to colleges not endowed with First Morrill Act funds. Of course, the statement is at odds with Senator Blair's initial response to Senator Hoar's suggested amendment. Nonetheless, it is much more detailed than the initial response and therefore likely reflects Senator Blair's views more accurately.

Senator Blair's statement, however, belies the balance of political forces at the time of the Second Morrill Act. To be sure, the Second Morrill Act's enactment largely resulted from fierce lobbying by the land-grant college presidents, an effort

obviously intended to obtain funds for these particular colleges and no others.[30]
Too, the college presidents were able to squelch Senator's Hoar proposal for ex-
plicit language permitting schools not receiving First Morrill Act funds to be given
Second Morrill Act appropriations. *See* Williams, *supra* note 2, at 144. It is
doubtful, however, that the college presidents had the political strength to obtain
explicit language confining Second Morrill Act appropriations to schools receiving
First Morrill Act funds. They faced powerful opposition from the Grange move-
ment, which had long "condemn[ed] the colleges for their inability to attract agri-
cultural students and vow[ed] to oppose the schools in every way," Williams,
*supra* note 2, at 3; *see* Eddy, *supra* note 2, at 73; Ross, *supra* note 2, at 79-80. The
strength of the Grange was reflected by the "Grange Amendment" to the Second
Morrill Act, which restricted application of the appropriations more narrowly and
explicitly than had the First Morrill Act. The college presidents were forced to
include these restrictions if they were to obtain even the Grange's sullen acquies-
cence in the Second Morrill Act. It is doubtful that the bill would have passed had
they not done so.[31] Even with such acquiescence, the Grange maintained their ef-
forts to redirect federal funding away from the existing land-grant colleges.[32]
There seems little doubt that the Grange would have opposed vociferously (and
probably successfully) any language that expressly confined Second Morrill Act
appropriations to schools receiving the benefits of the First Morrill Act.

---

[30] As one representative in the House complained:

I tell you, Mr Speaker, that the only lobby I have seen at this session of Congress was the educa-
tional lobby, composed of the presidents of the agricultural institutions They have haunted the
corridors of this Capitol; they have stood sentinel at the door of the Committee on Education,
they have even interrupted the solemn deliberations of that body by imprudent and impudent
communications. . My God, if there is any eagerness in the world it is possessed by these
gentlemen who are presidents of these agricultural colleges. . . . They have buzzed in your ears,
sir, and in yours, and in the ears of every member of this House. It has been an organized,
strong, combined lobby for the benefit of the agricultural colleges of the country.

21 Cong. Rec 8836 (1890) (remarks of Rep. Caruth)

[31] *See* Williams, *supra* note 2, at 143-49; Eddy, *supra* note 2, at 101, 103; Ross, *supra* note 2, at 178; 26
Stat at 418. The Grangers were chiefly concerned that the new appropriations not be diverted to classical
languages and other studies that they did not consider appropriate for an agricultural college *See, e.g*,
Williams, *supra* note 2, at 147. The Grange had similarly limited the achievements of the land-grant college
presidents only three years earlier concerning the bill that became the Hatch Act, when they successfully
forced an amendment, also known as the "Grange Amendment," that preserved for the states the option of
maintaining agricultural experiment stations independent from the land-grant colleges. The land-grant col-
leges had desired in the Hatch Act to bring such stations under their exclusive control *See id.* at 113-15,
Ross, *supra* note 2, at 140.

[32] *See* Williams, *supra* note 2, at 152 ("At its annual meeting in 1891, the Grange declared the land-grant
colleges to be 'practically worthless' and implored Congress to separate the agricultural departments from
existing colleges, establishing new and purely agricultural institutions around them 'We further ask,' the
Grange added, 'that all appropriations now paid to the combined institutions . . be transferred to such sepa-
rate and distinct agricultural and mechanical colleges as may be established in the several states '") (footnote
omitted); Edmond, *supra* note 2, at 33 (Yale College, Brown University, and Dartmouth received land-grant
designation from their respective state legislatures during the 1860s but lost it to agricultural colleges during
the 1890s as a result of opposition from the state Grange and agricultural societies who resented the former
schools' perceived emphasis on instruction in classical as opposed to agricultural studies).

Significantly, the land-grant college presidents themselves were not so certain that the Second Morrill Act appropriations could be confined to their institutions under the language of that Act as it was enacted. They were even fearful that the Second Morrill Act could actually be interpreted to deny them such funds altogether. Thus, barely two months after the enactment of the Second Morrill Act:

> Atherton and Alvord [two influential land-grant college presidents who had each played a major role in lobbying for the Second Morrill Act] were extremely anxious about the potential for rogue initiatives—especially from the Grange—to exclude land-grant colleges from receiving the benefits of the act or to qualify non-land-grant colleges for the new funds. Thus, they prepared a "Brief of Points" for Assistant Interior Secretary Chandler and distributed it as appropriate to various land-grant colleges. In their document, Atherton and Alvord interpreted the second Morrill Act as a "supplement to the Act of 1862." They were careful to note that the latter act applied only to institutions designated by their state legislatures to receive funds from the original act. Anticipating arguments to the contrary, Atherton and Alvord emphasized that the broad nature of the original act, and the power it gave to the various states to develop their land-grant colleges according to the demands of local conditions, had given rise to a disparate class of institutions . . . . They further emphasized that questions of institutional purpose and organization . . . had already been settled in the various states "and cannot now be raised to debar them from the benefits of the Act of 1890."

Williams, *supra* note 2, at 151-52 & n.75. It seems likely that the land-grant college presidents would have obtained explicit language in their favor two months earlier if they could have done so. Thus, the absence of such language from the Second Morrill Act does not appear to be mere oversight. Rather, it appears to reflect a stalemate between the college presidents and the Grange. In these circumstances, we do not find the single (somewhat contradictory) statement by Senator Blair to be controlling of our interpretation of the Second Morrill Act.

In sum, although the statute (including its legislative history) is not unambiguous, we conclude that the balance of the evidence supports the view that the Second Morrill Act's appropriations may be given to colleges regardless of whether they are endowed under the First Morrill Act. Accordingly, West Virginia could validly designate State College to receive appropriations under the Second Morrill Act.

## V. CONCLUSIONS

We conclude that West Virginia could validly designate State College as a recipient of Second Morrill Act appropriations without designating it to receive First Morrill Act funds. We further conclude that, regardless of State College's eligibility for Second Morrill Act appropriations, it is not among those colleges eligible for benefits under the 1890 derivative statutes.[33]

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[33] Agriculture may wish to request that Congress refer specifically to the 1890 colleges in its future appropriations pursuant to the 1890 derivative statutes. This step would supersede any arguably broader language in the 1890 derivative statutes themselves, and would thereby remove all doubt about the intended beneficiaries of these statutes *See supra* text accompanying note 12